MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:       2016 ME 33
Docket:         Som-14-101
Argued:         November 6, 2014
Decided:        February 18, 2016

Panel:          SAUFLEY, C.J., and MEAD, GORMAN, JABAR, and HJELM, JJ.[*]
Majority:       SAUFLEY, C.J., and GORMAN, JABAR, and HJELM, JJ.
Dissent:        MEAD, J.

SOMERSET COUNTY

v.

DEPARTMENT OF CORRECTIONS

HJELM, J.

[¶1]  This case calls for us to construe legislation that bears on a financial dispute between Somerset County and the former State of Maine Board of Corrections.  The County receives income generated by boarding federal prisoners at the Somerset County Jail (SCJ), and that income is used to support the jail budget.  When the County received more federal boarding revenue than anticipated during fiscal year (FY) 2013, it then—without consulting with or receiving approval from the Board—applied a portion of that surplus income to debt service for the cost to construct the SCJ facility.  In response, the Board, which had statutory authority to establish and amend most aspects of the counties' correctional services budgets, correspondingly reduced the amount of the County's

---

[*]  Silver, J., sat at oral argument and participated in the initial conference but retired before this opinion was adopted.

corrections funding from other sources. The County appealed that agency action to the Superior Court (Somerset County, *Alexander, J.*), which concluded that controlling legislation did not authorize the Board to adjust payments to the County as a result of the County's unauthorized use of surplus federal boarding income. On this appeal filed by the Board, we vacate the Superior Court's judgment and remand for entry of judgment in favor of the Department of Corrections (DOC) as the party substituted for the Board.

## I. SUBSTITUTION OF PARTIES

[¶2] We first address the justiciability of this action. During the pendency of this appeal, the State of Maine Board of Corrections was abolished. *See* P.L. 2015, ch. 335 (emergency, effective July 12, 2015) (codified in scattered sections of 1 M.R.S., 4 M.R.S., 5 M.R.S., 14 M.R.S., 30-A M.R.S., and 34-A M.R.S.). At our direction, counsel for the County and for the Board filed memoranda addressing the question of whether, in light of that legislative development, the County's claim remained justiciable. Based on those filings, we then gave the County an opportunity to file a motion that would bring into this action an existing entity to substitute for the Board, which no longer exists. *See* M.R. Civ. P. 25(c); M.R. App. P. 10.

[¶3] The County filed a motion to substitute DOC for the Board, arguing that many of the responsibilities held by the Board, including some of the financial

management of the county jail system, were transferred to DOC, and so DOC became the proper entity in this financial dispute to stand in the Board's shoes. The County supported its motion with an affidavit executed by Sagadahoc County Sheriff Joel A. Merry, who had been a member of the Board since 2014 and was serving as its Chair when it ceased to exist in July 2015. In his affidavit, Sheriff Merry certified that as the Board wound up its financial responsibilities, it prepared a final report of its remaining funds as of June 30, 2015. Sheriff Merry stated that the report, which he appended to his affidavit, "reflects a FY2014 carry forward of $560,884 for the anticipated expenditure to Somerset County for FY2013, which [the Board] understood could be distributed, depending upon the result of the pending litigation." The sum of $560,884 is the combined amount in dispute in this action and a companion case that raises the same issues. *See infra* n.6.

[¶4] DOC filed a memorandum in opposition to the County's motion, disputing the County's assertion that the Board created the reserve referenced in Sheriff Merry's affidavit and contending that the financial provisions in the legislation abolishing the Board did not allow any fiscal room to satisfy the County's claims if the County were successful here.

4

[¶5]  Although the record creates some measure of ambiguity,[1] we cannot disregard Sheriff Merry's sworn assertion that funds from the Board's budget were earmarked to pay the County if we were to hold that the Board erred by withholding money otherwise due to the County.  Further, pursuant to the legislation that abolished the Board, the money in the Board's budget was to be carried forward to the County Jail Operations Fund General Fund account administered by DOC.  P.L. 2015, ch. 335, §§ 22, 23, 29 (codified at 34-A M.R.S. §§ 1208-B, 1210-D (2015)).  Although the new legislation generally prescribes the way DOC is to use that money, *see* P.L. 2015, ch. 335, § 23 (codified at 34-A M.R.S. § 1210-D), it does not affirmatively foreclose the creation of the reserve fund described in Sheriff Merry's affidavit.

[¶6]  The record therefore is sufficient for us to determine that the process by which the Board was eliminated preserved the justiciability of this action.  According to Sheriff Merry's affidavit, money that would be used to satisfy a judgment was set aside to DOC.  Because DOC thereby was given the role of the responsible party in the event the County were to prevail here, DOC may be properly substituted for the Board.  *Cf. Skolnick v. Kerner*, 435 F.2d 694, 695 (7th Cir. 1970) (holding that "a pending suit, even if properly instituted against an

---

[1]  That ambiguity is created by a second affidavit executed by Sheriff Merry, submitted by DOC in support of its opposition to the County's motion, in which he qualified some of the statements he made in the first affidavit.

existing governmental agency, [must] abate when the agency dissolves without a successor assuming its powers and functions."). Accordingly, we grant the County's motion and substitute DOC for the Board as the defendant and appellant in this action.

## II. BACKGROUND

[¶7] The facts are not in material dispute. In 2008, the Legislature created the Board of Corrections to oversee Maine's coordinated corrections system. P.L. 2007, ch. 653, part A, § A-30 (emergency, effective Apr. 18, 2008); 34-A M.R.S. §§ 1801-1807 (2013).[2] One of the Board's functions was to "[r]eview, amend if necessary and adopt the correctional services expenditures in each county budget under Title 30-A, section 710." 34-A M.R.S. § 1803(1)(A). In 2012, the County submitted its proposed SCJ budget for FY 2013 to the Board, which approved a total budget of $6,805,069. The approved expenses did not include debt service for the County's new jail facility.

[¶8] The SCJ budget was funded primarily through three sources. First, the County itself was to pay $4,863,215 from taxes assessed and collected from local

---

[2] Several of these sections have since been amended and other sections have been added. Of those modifications, among the most significant, for purposes of this case, can be found at P.L. 2013, ch. 598, §§ 8-10, 12-22, 27, 41 (effective May 1, 2014) and P.L. 2015, ch. 335 (emergency, effective July 12, 2015) (abolishing the Board of Corrections). Although many of the statutes cited in this opinion have undergone significant changes, all citations are to statutes in effect at the time these issues arose.

6

municipalities. *See* 30-A M.R.S. § 701(2-A) (2012).[3] Second, the County was to receive $1,131,768 from the State Investment Fund, which consists of money appropriated from State General Fund accounts and Other Special Revenue Funds accounts. *See* 34-A M.R.S. §§ 1805(1), (3). Third, the budget was supported with estimated revenue of $450,960 that the County expected to receive from the United States Marshals Service to board federal prisoners at the SCJ.[4] The record indicates that this was the total amount of federal boarding revenue that the County expected to receive in FY 2013, based on the amount of income actually received during the previous fiscal year.

[¶9] On July 31, 2012, the Board approved payment of $560,833 to the County, which constituted the State Investment Fund disbursement for the first two quarters of FY 2013.

[¶10] When the second quarter of FY 2013 ended, the County had already received $660,259 in federal prisoner boarding revenue. Because this amount substantially exceeded the amount of federal revenue that the County expected to receive for the entire fiscal year, on January 2, 2013, the County Commissioners

---

[3] This statute was amended in a way that is not pertinent to this case effective July 1, 2013, *see* P.L. 2011, ch. 431, § 1, and underwent subsequent amendments before it was repealed and replaced by P.L. 2015, ch. 335 §§ 9, 11 (emergency, effective July 1, 2015) (codified at 30-A M.R.S. § 701(2-C) (2015)). Additionally, the amounts of funding designated by statute differ from the corresponding amounts referenced in the record. Although these discrepancies are not explained in the record, they are not material to the issues presented on appeal.

[4] By contract, the Marshals Service pays the County $90 as the daily board fee for each federal prisoner and $22.50 per hour for transportation.

passed Resolution 13-007, which directed how federal prisoner boarding revenue in excess of the originally anticipated amount of $450,960 would be used. Under the Resolution, twenty-five percent of that surplus would be transferred into a dedicated Jail Capital Improvement Fund, and the remaining seventy-five percent would be applied to the County's jail debt service. Resolution 13-007 was made retroactive to July 1, 2012, which was the starting date for FY 2013. The County did not seek or obtain approval from the Board for this disposition of surplus federal boarding revenue.

[¶11] The County submitted a financial report to the Board for January 2013, showing that it had applied federal boarding receipts of $445,547 to the Jail Capital Improvement Fund and the SCJ debt as authorized by the Resolution.[5] The County then requested its third and fourth quarter disbursements for FY 2013 from the Board. At a meeting held in March 2013, the Board deferred any decision on the County's request until it could consider whether the requested disbursements would be affected by the County's use of the surplus federal prisoner boarding revenue under the Resolution. During this period of time in

---

[5] In documents reflecting federal boarding revenue, the County presented this amount as a loss for January 2013 even though the County in fact received federal boarding revenue for that month. Creating a negative figure was the accounting mechanism the County employed to change the use of federal boarding revenue that was approved by the Board in the FY 2013 budget to the use prescribed by Resolution 13-007.

February and March 2013, the Board received projections forecasting a State Investment Fund deficit of between approximately $725,000 and $965,000.

[¶12]  At a meeting held on April 3, County representatives argued to Board representatives that the County was entitled to apply surplus federal boarding revenue toward its jail debt service without the Board's approval.  After that meeting, the Board provided the County with a further opportunity to submit additional argument or supporting material.  County representatives did not respond, and on April 23 the Board voted to withhold the third quarter State Investment Fund disbursement of $280,442 that was due to the County under the original budget.[6]  Three days later, the Board sent a letter to the County explaining its position that under Maine law, payments from the State Investment Fund can be used only for correctional services approved by the Board; that the County's use of surplus federal prisoner boarding revenue was effectively an unauthorized use of State Investment Fund money; and that the Board was therefore foreclosed from disbursing the third quarter payment.  The Board further explained that if it were to release that payment to the County, it would not be administering "a coordinated correctional system that demonstrates sound fiscal management" as was required by statute.  *See* 34-A M.R.S. § 1801(1).

---

[6]  According to the Superior Court's order, the Board also withheld the fourth quarter disbursement from the State Investment Fund and the County filed a Rule 80C appeal from that decision.  By agreement of the parties, that separate action has been stayed pending resolution of the case at bar.

[¶13]  Pursuant to 34-A M.R.S. § 1803(9), 5 M.R.S. §§ 11001 and 11002 (2014), and M.R. Civ. P. 80C, the County appealed to the Superior Court, which vacated the Board's decision to withhold the third quarter State Investment Fund disbursement.  From that judgment, the Board filed a timely appeal.[7]

### III.  DISCUSSION

[¶14]  "When the Superior Court acts in an intermediate appellate capacity pursuant to M.R. Civ. P. 80C, we review the [administrative agency's] decision directly for errors of law, abuse of discretion, or findings not supported by substantial evidence in the record."  *Merrill v. Me. Pub. Emps. Ret. Sys.*, 2014 ME 100, ¶ 13, 98 A.3d 211 (quotation marks omitted).  "The party seeking to overturn the Board's decision bears the burden of persuasion on appeal." *Id.* (quotation marks omitted).   To determine if the Board had the statutory authority to amend the County's allocation of State Investment Fund money in response to the County's use of surplus federal revenue under Resolution 13-007, we first examine the statutes that governed the Board's role in financial matters

---

[7]  The Board argues that the County is not entitled to relief on appeal because it failed to exhaust its administrative remedies.  We find no merit to this contention.  The claimed failure is based on the County's apparent choice not to present further argument when the matter was pending before the Board in April 2013.  The County, however, had made its position known to the Board, which thereby was in a position to consider and act on it.  *Cf. Carrier v. Sec'y of State*, 2012 ME 142, ¶ 18, 60 A.3d 1241 ("Issues not raised at the administrative level are deemed unpreserved for appellate review." (quotation marks omitted)).  Further, the Board does not point to an established or settled procedure that required the County to take action of some sort.  Because the County was an active participant in the agency process and conveyed its position for the Board's consideration, we decline to attach significance to the County's lack of response to the Board's isolated ad hoc invitation.

10

pertinent to county jails, and we then apply those statutes to the parties' specific dispute.

A.     Statutory Overview of the Coordinated Corrections System

[¶15]  The Board served as the comprehensive and integrated management authority over "a coordinated correctional system" of local facilities and programs. 34-A M.R.S. § 1801(1).  The express statutory purpose of the Board was "to develop and implement a coordinated correctional system that demonstrates sound fiscal management, achieves efficiencies, reduces recidivism and ensures the safety and security of correctional staff, inmates, visitors, volunteers and surrounding communities."  *Id.*  To allow the Board to discharge these responsibilities, the Legislature gave the Board considerable breadth of responsibility and authority.  In areas aside from financial management, the Board's responsibility and authority included determining how individual correctional facilities were to be used (including whether a facility will be downsized or even closed); promulgating standards for a number of correctional practices, including those affecting the treatment of inmates with mental illnesses; implementing a certificate-of-need process to determine whether correctional construction projects could proceed; and receiving and reviewing recommendations from many sectors and stakeholders regarding "the delivery of state and county corrections services." *Id.* § 1803(2)-(6).

[¶16] Significant to this case, the Legislature also empowered the Board to comprehensively oversee and control the finances of county correctional facilities. In order to achieve the goal of developing and implementing a "system that demonstrates sound fiscal management," *id.* § 1801(1)(C), the Board was required to create "a plan to achieve systemic cost savings and cost avoidance" through operational efficiencies, *id.* § 1803(1). As part of this grant of authority, the Board was required to "[r]eview, amend if necessary and adopt the correctional services expenditures in each county budget." *Id.* § 1803(1)(A). The Board also was responsible for identifying and approving "cost-saving agreements and efficiencies" to reduce expenses and share resources. *Id.* § 1803(5)(A). Further, the Board had the administrative responsibility to submit to the Governor a budget for the State Investment Fund, which was one of the two primary sources of capital used to operate the correctional services it oversaw. *Id.* §§ 1803(5)(E), 1805. As is clear from the Legislature's broad and multi-layered grant of power and authority, the Board had a comprehensive level of control over local correctional budgets.

[¶17] By statute, there were two principal categories of funding that financed the coordinated correctional system: money collected by counties from municipalities pursuant to 30-A M.R.S. § 701(2-A), and the State Investment Fund created in 34-A M.R.S. § 1805.

12

[¶18]  To generate the first of these funding sources, each county was required to collect a fixed amount from local municipalities.  30-A M.R.S. § 701(2-A).  Counties were then required to use those municipal funds for "correctional services, excluding debt service." *Id.*  As defined by section 701(2-A), the term "'correctional services' include[d] the management services, personal services, contractual services, commodity purchases, capital expenditures and all other costs, or portions thereof, necessary to maintain and operate correctional services."[8]  The express terms of section 701(2-A) made this definition applicable only to that subsection.

[¶19]  Because counties were prohibited from paying "debt service" with the municipal funds collected pursuant to section 701(2-A), counties had to pay jail construction debt from other revenue or funds.  To retire county jail debt that existed as of July 1, 2008, which is the date the Board came into existence, 30-A M.R.S. § 701(2-B) (2012) required counties to collect taxes from municipalities separately from funds collected under section 701(2-A).

---

[8]  This statute was amended in 2013 so that "county jail debt" became excluded from the definition of "correctional services," instead of "debt service" being a type of correctional service to which the municipal funds may not be applied.  *See* P.L. 2013, ch. 598, § 3 (effective May 1, 2014) (codified at 30-A M.R.S. § 701).

[¶20] Title 30-A M.R.S. § 924 (2012)[9] specified the ways that counties were required to use unencumbered funds that remained at the end of a fiscal year. As pertinent here, subsection 924(3) required—as it does now—that surplus "[c]orrectional services funds" be used only for "corrections services," in contrast with surplus funds in other accounts, which were not subject to that type of restriction. Although the Legislature defined "correctional services" in section 701(2-A), it did not define the terms "correctional services funds" or "corrections services" as used in section 924. The definition of "correctional services" found in section 701(2-A) was confined to that subsection and did not apply to the same phrase in section 924, leaving the phrase undefined in that setting. *See Aydelott v. City of Portland*, 2010 ME 25, ¶ 12, 990 A.2d 1024.

[¶21] The second of the two principal funding categories was the State Investment Fund, which had two sources: money appropriated from the State's General Fund, and accounts that made up "Other Special Revenue Funds," which contained money credited from several specific sources and money otherwise designated for use in the State Investment Fund. 34-A M.R.S. § 1805(1), (3). The purpose of the State Investment Fund was to supplement the municipal funds collected by counties pursuant to section 701(2-A), in order "to support the actual

---

[9] Section 924 has since been amended, *see* P.L. 2013, ch. 16, § 10 (effective Oct. 9, 2013) (codified at 30-A M.R.S. § 924 (2014)), but the amendment does not affect this appeal.

14

costs of corrections" that were approved by the Board and the Legislature. 34-A M.R.S. §§ 1803(5)(A), (E), 1805(2).  Because the amount of the counties' payments into the coordinated correctional system was fixed, the State was responsible for providing additional money, including increases over time, needed to finance the system.

B.    Application of Statutes to Federal Boarding Revenue

[¶22]   We now consider the effect of this statutory framework on the County's use of surplus federal boarding revenue.

[¶23]  The Board argues that the County did not have the statutory authority to apply surplus federal boarding revenue to reduce its jail debt.  The Board further contends that when the County did so, the Board was then either required or, as a discretionary matter, authorized to withhold money that was otherwise due to the County under the budget it had approved for FY 2013.  The County contends that the Board had no authority to control federal boarding revenue received by the County.

[¶24]  The statutes governing the financial relationship between the Board and county jails did not expressly address the use or effect of federal boarding revenues that counties might have received: federal boarding revenue was not one of the funding sources specifically described in the statutes governing the coordinated correctional system, and the statutes did not explicitly mention or

address the permissible uses of that money or the Board's right to control it.[10] The issue presented here is where federal boarding revenue fit within the overall financial framework for the coordinated correctional system established by the Legislature.[11]

[¶25] The dispute between the parties is entirely a question of statutory interpretation. In construing statutes, "our single goal is to give effect to the Legislature's intent in enacting the statute." *Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 19, 107 A.3d 621. To accomplish this result in the case of a statute administered by an administrative agency,

> [o]ur first inquiry is to determine de novo whether the statute is ambiguous. An ambiguous statute has language that is reasonably susceptible of different interpretations. Second, we either review the agency's construction of the ambiguous statute for reasonableness or plainly construe the unambiguous statute. We accord great deference to the agency's interpretation if the statute is considered ambiguous, but will apply a different interpretation if the statute plainly compels a contrary result.

---

[10] The only statutory reference to federal boarding revenue was one that removed from the Board responsibility to establish boarding rates. 34-A M.R.S. § 1803(1)(C) (2013).

[11] Although the statutes that were in effect at the time relevant to this case do not expressly address this issue, thereby requiring us to engage in the process of statutory construction, the Legislature subsequently amended the governing statute to allow counties to retain both federal and state boarding revenue and allocate it in a way that is similar or identical to the formula set out in Resolution 13-007, without an offset against the appropriation approved by the Board. 34-A M.R.S. § 1812(4) (2014). After the events at issue here, the Legislature also enacted a statute giving the Board authority to "curtail funds as necessary to address shortfalls." 34-A M.R.S. § 1812(5) (2014). Even though many of these statutes have been affected by even more recent legislation, because these statutes were not in effect at the time the Board withheld the County's appropriation in FY 2013, and because the Legislature did not make them retroactive, they are not applicable to this action, and we decline to use them as *post hoc* interpretive aids to the construction of statutes that were in effect previously. *See, e.g.*, *MacImage of Me., LLC v. Androscoggin Cty.*, 2012 ME 44, ¶¶ 22-23, 40 A.3d 975.

16

*Merrill*, 2014 ME 100, ¶ 13, 98 A.3d 211 (quotation marks omitted).

[¶26]  We conclude that under the statutory scheme that governed the fiscal relationship between the Board and county jail administration, the Board was authorized to control the disposition of federal boarding revenue for the following reasons: (1) a detailed examination of the applicable statutes reveals that revenues generated by boarding federal prisoners constituted "correctional services funds" and were not subject to the County's control; (2) when the statutory coordinated correctional system is viewed at the macro level, the Board was the entity with ultimate control over county jail funding issues, which would include the use of federal boarding revenue; and (3) the County's assertion that the Board had no control over the use of federal boarding revenue is undermined by the County's own agreement to use that revenue as a funding source for the budget that it submitted to the Board for the Board's approval.  We will examine these three issues in turn and then review the Board's actions.

1.      Federal Boarding Revenue as "Correctional Services Funds"

[¶27]   First, section 924(3) of title 30-A provided, as it still does, "Correctional services funds may be expended only for corrections services." Federal boarding revenue consists of payments made by a federal agency to compensate a county for housing, transporting, and otherwise providing for federal

prisoners. Those services are "correctional services" within the plain meaning of that phrase. Revenues generated by those services were therefore "correctional services funds" and, under section 924, may have been used only for "corrections services."[12] The resulting question is whether payments made toward the construction costs of a jail were expenditures for "corrections services."

[¶28] The Legislature did not define the phrase "corrections services" for purposes of section 924. Because it is susceptible to more than one interpretation, it is ambiguous. *See Merrill*, 2014 ME 100, ¶ 13, 98 A.3d 211. It certainly encompasses the day-to-day support needed to maintain a facility's population and to achieve the programmatic objectives of the coordinated correctional system. However, it also may reasonably be construed more expansively to include construction of the infrastructure and physical plant that is required for the system to exist and operate. Under this latter interpretation of section 924, the cost to build a jail facility would be an expenditure for corrections services.[13]

---

[12] Section 924 addresses the permissible uses of unencumbered funds that remain unspent at the end of a fiscal year, although the particular provision at issue is not limited in that way. Neither party argues that the statutory restriction on the use of correctional services funds would arise only at that time. Further, such a construction would be a difficult one because it would allow counties to avoid the effects of the restriction simply by disposing of surplus funds at any other time—even moments prior to the end of a fiscal year, thereby defeating the clear legislative intent of the statute. Therefore, although the financial transactions relevant to this action did not coincide with the end of a fiscal year, they remain controlled by the fiscal restriction created in section 924.

[13] In its assertions about the meaning of section 924, the Board attaches significance to a subsequent amendment to section 701(2-A), which provides, "Correctional services does not include county jail debt." 30-A M.R.S. § 701(2-A) (2014). This contention fails for two reasons. First, in both versions of section 701(2-A), the Legislature expressly limited the definition to that subsection, and it therefore does

18

[¶29]  Because of the particular nature of the parties' dispute, however, we need not specifically determine whether, as a matter of statutory interpretation of section 924, corrections services expenditures could be interpreted to include payments toward a jail's construction cost.  Regardless of how the statute is construed, the County's unilateral application of federal boarding revenue toward the construction costs of the jail was contravened by the legislative scheme governing the coordinated correctional system.

[¶30]  If the construction of the jail facility were a type of "corrections service," then any use of federal revenue to pay for the construction debt would have been subject to the Board's control because pursuant to section 1803(1)(A), the Board was vested with oversight authority over the counties' "correctional services expenditures."  When sections 924 and 1803(1)(A) are read in this way, the County would not be entitled to dedicate federal boarding revenue to its jail debt without the Board's approval.  Here, without the Board's approval—and in fact over its opposition—the County diverted a portion of a revenue stream that would have been under the Board's control.  Under this reading of the statute, the County's actions would be improper.

---

not carry over to other statutes, such as section 924.  Second, we decline to engage in the logical fallacy of attempting to discern the Legislature's intention underlying an earlier version of a statute through the lens of subsequent changes to that law.  *See MacImage of Me., LLC*, 2012 ME 44, ¶¶ 22-23, 40 A.3d 975.

[¶31]  Alternatively, if the construction of the county jail were not a "corrections service" within the meaning of section 924, then that statute would have barred the County from using federal boarding revenue to pay for the construction, because that revenue, comprising "[c]orrectional services funds," could have been used only for corrections services.  Under this alternative reading of the statute, such services would not encompass construction costs, and the County would have misapplied corrections-related funds.

[¶32]  The County argues that the Board did not have statutory authority to control federal boarding revenue because that money was neither a municipal tax assessment nor part of the State Investment Fund over which the Board had express fiscal authority.  For several reasons, however, this view is too narrow.  First, pursuant to 30-A M.R.S. § 710(2) (2013),[14] the Board had authority to "review, amend if necessary and approve each county correctional services budget."  The plain language of this statute created a grant of authority that was not limited to the mere *use* of budgeted funds but included other aspects of a budget, including revenue.  Second, it would make little sense to limit the fiscal authority of the Board, which had the primary authority over the coordinated correctional system, to controlling expenditures without the ability to reach the corresponding

---

[14]  Section 710(2) was later amended and repealed.  *See* P.L. 2013, ch. 598, § 6 (effective May 1, 2014) (codified at 30-A M.R.S. § 710 (2014)); *see also* P.L. 2015, ch. 335 § 14, repealing section 710 (emergency, effective July 1, 2015).

essential feature of a budget, namely, income. We cannot conclude that the Legislature gave the Board responsibility to ensure "sound fiscal management" of the coordinated correctional system, 34-A M.R.S. § 1801(1), with authority extending to only one side of the balance sheet.

[¶33] Additionally, under the County's analysis, it would have been entitled to use federal boarding revenue for any purpose and still incur costs to maintain federal prisoners, which then would have had to be subsidized by the State Investment Fund. We find it unlikely that the Legislature intended such a result when it established the coordinated correctional system administered by the Board.

2.      Overall Role of the Board in Financial Governance of County Jails

[¶34] Second, because the statutes that were in effect when this dispute arose did not provide clear guidance about the use and effect of federal boarding revenue, we place particular weight on the overall statutory structure that governed the coordinated correctional system. The broad view of that statutory scheme reveals the Legislature's intent to vest the Board with a comprehensive level of control over the finances of county jails. As the Legislature itself characterized the arrangement, the correctional system was a "coordinated" one. 34-A M.R.S. § 1801(1). Although the Board and the counties were constituents, the system was a unified one, and the Board served as the central, unifying element. The system's cohesiveness would have been diminished if counties were to operate

independently on financial matters that bore directly on corrections. Such financial matters were within the express grant of power to the Board and were fundamental to the operation of the coordinated system.

3. The County's Submission of Federal Boarding Revenue to the Board's Control

[¶35] Finally, the County's assertion that the Board had no authority to "count[] or control[]" federal boarding revenue is undermined by the County's own agreement to include that money in the proposed budget it submitted to the Board for the Board's approval. In the proposed FY 2013 budget that the County presented to the Board, the County proposed to use all of that fiscal year's anticipated federal boarding revenue to pay expenses included in the corrections budget that the Board was authorized to approve and control. This plainly demonstrates that, contrary to its present assertion, the County itself treated federal boarding revenue as a funding source controlled by the Board.

4. The Board's Actions

[¶36] For these reasons, the Board correctly concluded that the County acted outside of its legal authority by using surplus federal boarding revenue for purposes that the Board had not approved. Based on this determination, the Board declined to make the third quarter disbursement from the State Investment Fund, thereby effectively amending the County's corrections budget. Pursuant to section

1803(1)(A), the Board was fully authorized to "amend if necessary and adopt the correctional services expenditures in each county budget." We afford deference to the Board's determination that it was "necessary" to withhold payment. 34-A M.R.S. § 1803(1)(A); *see also id.* § 1801(1) (charging the Board with the responsibility of developing and implementing a "system that demonstrates sound fiscal management"); *Merrill*, 2014 ME 100, ¶ 13, 98 A.3d 211 (stating that agency action is reviewed for an abuse of discretion).

[¶37]  The record supports that determination.  As a general matter, the Board was entitled to determine that when the County used surplus correctional revenues for debt service rather than for needs addressed in an established corrections budget, it was necessary to amend the budget and correspondingly reduce the amount of financial support that the Board had agreed to provide. Additionally, when the County unilaterally allocated surplus correctional services funds to its own objectives, the actual financial demands of the state-wide coordinated correctional system had placed pressure on the budget, and in fact the Board anticipated that the system's existing funding would be insufficient to cover the FY 2013 budget.  Given these circumstances, the Board was warranted in determining that it was "necessary" to adjust the amount of appropriations from other sources for the County's corrections budget.

[¶38] The County further argues that the Board abused its discretion when it failed to disburse amounts otherwise due from the State Investment Fund, because the Board did not withhold appropriations from any other county. The County also points to the Board's willingness to make a quarterly payment to another county that the Board characterized as a "team player," even if the payment exceeded that county's actual needs. Somerset County, however, created a unique situation because it diverted correctional funds that, if used in a way that was within statutory parameters, would have reduced its need for payments from the State Investment Fund. Regardless of whether the Board properly decided to make State Investment Fund disbursements to other counties, we conclude that the Board acted within its authority when it took action affecting the disbursement otherwise due to Somerset County.

## IV. CONCLUSION

[¶39] We therefore hold that the Board did not err when it refused to make the third quarter State Investment Fund payment based on its determination that the action was necessary to offset the County's unauthorized application of federal boarding revenue to jail construction debt service.

The entry shall be:

> The Department of Corrections is substituted for
> the Board of Corrections.

24

Judgment vacated.  Remanded to Superior Court
for entry of judgment in favor of the Department
of Corrections.

---

MEAD, J., dissenting.

[¶40]  I respectfully dissent.  I do not disagree with the Court's discussion of the history and statutes relating to the establishment of the State Board of Corrections.  I agree also with the Court's statement of the central issue raised in this matter: "The issue presented here is where federal boarding revenue fit within the overall financial framework for the coordinated correctional system established by the Legislature."  Court's Opinion ¶ 24.  I agree that the answer turns on questions of statutory interpretation.  Court's Opinion ¶ 25.

[¶41]  The legislative record is abundantly clear that the motivation behind the creation of the Board of Corrections was to reap the benefits afforded by centralized administration of the correctional services rendered by the state's fifteen county jails, each of which was previously required to administer its own incarceration, pretrial detention, and transport services.  The Board was vested with broad authority to develop goals and processes to accomplish cost savings while serving overarching correctional objectives.

[¶42] Maine's criminal justice system requires the availability of short-term, local detention facilities. Each county jail has historically provided these services with little or no collaboration or communication with other county jails offering identical services. As jail costs have risen, counties have struggled to shoulder onerous financial burdens. As the Court points out, the Board of Corrections was the Legislature's response to the need to reconfigure the county jail system. Court's Opinion ¶ 15.

[¶43] Several counties undertook to modernize their aging jail facilities prior to the creation of the State Board of Corrections and incurred substantial construction debt in the process. Although the record is less than clear, it can fairly be inferred that Somerset County significantly overbuilt its new county jail with a clear intent to recoup construction costs by using its surplus capacity to house inmates from courts of other jurisdictions (principally the federal courts) and apply the boarding fees to retirement of the construction debt. The boarding capabilities of the Somerset County Jail create a quasi-proprietary income-generating mechanism for the County.

[¶44] In April 2015, the Board of Corrections withheld the previously authorized disbursement due to Somerset County from the State Investment Fund after having been advised that Somerset County directed $445,547 in surplus federal boarding revenues to its Jail Capital Improvement Fund and existing jail

debt. The Board predicated its action upon the assertion that federal boarding revenues fell within its exclusive purview and authority.

[¶45] Through the approach it took, the Board of Corrections overstepped its statutory authority and effectively appropriated these proprietary boarding fees. The Board treated the federal boarding revenues as though they were assets of the State Board of Corrections Investment Fund as established by 34-A M.R.S. § 1805 (2013).[15] For all of its forward thinking and planning, Somerset County's reward was to have its earmarked debt-reduction funds diverted and replaced with the Board's disheartening suggestion that it seek debt reduction funds through yet another tax on the residents of Somerset County. I do not believe the Legislature intended such a result, and I believe the plain language of the statute provided otherwise.

[¶46] The Board's broad grant of authority established by 34-A M.R.S. § 1803 (2013) was clearly directed to the objectives of obtaining cost savings and encouraging efficiency within the county jails while accomplishing the jails' core responsibility to house prisoners and pretrial detainees from the *state* judicial

---

[15] Title 34-A M.R.S. § 1805(3) (2013) designated sources of funds for the Investment Fund. It did not provide for boarding fees to be incorporated into the fund. Title 34-A M.R.S. §§ 1801-1807 were repealed by P.L. 2015, ch. 335, § 27 (emergency, effective July 12, 2015).

system.[16]    No language appeared anywhere within title 34-A, chapter 1, subchapter 5 suggesting that the Board was created to address any aspect of boarding federal detainees.   Indeed, the only mention of federal detainees was found at 34-A M.R.S. § 1803(1)(C), which clearly provided that the Board had no role in setting boarding rates for federal inmates.[17]    Accordingly, the word "corrections" and the phrases "correctional services" and "correctional services funds," 34-A M.R.S. §§ 1801-1806 (2013), must be viewed in the context of the jails' duty to house inmates committed by the courts of the State of Maine.   Thus, the revenue stream received by the county for housing detainees committed by the federal courts or courts of foreign jurisdictions was outside the scope of authority of the Board of Corrections.

[¶47]   The Court invokes 30-A M.R.S. § 924(3) (2012), which provided in part that "[c]orrectional services funds may be expended only for corrections services,"[18] for the proposition that

---

[16]   The county jails were and are under no legal obligation to accept detainees from any jurisdiction other than the State of Maine.

[17]   Title 34-A M.R.S. § 1803(1)(C) (2013) provided: "[T]he board is charged with the following responsibilities and duties. . . . [e]stablish[ing] boarding rates for the coordinated correctional system, except boarding rates for federal inmates."

[18]   Section 924 governed unencumbered surplus funds remaining at the end of a fiscal year.   It provided, in part:

> If not used for [designated higher priority] purposes, any remaining surplus funds may
> not be expended but must be retained as working capital for the use and benefit of the
> county except that correctional unencumbered surplus may not lapse to the county's

> [f]ederal boarding revenue consists of payments made by a federal agency to compensate a county for housing, transporting, and otherwise providing for federal prisoners. Those services are "correctional services" within the plain meaning of that phrase. Revenues generated by those services were therefore "correctional services funds" and, under section 924, may have been used only for "corrections services."

Court's Opinion ¶ 27.

[¶48]  I respectfully disagree with the Court's reasoning.  The act of housing, feeding, and transporting federal prisoners while they are in custody may arguably be considered to be providing correctional services.  However, the fact that a county receives contracted fees in return for those services that may, or may not, reflect the out-of-pocket value of such services, does not ipso facto establish that those monies are "correctional services funds."  Indeed, common usage would suggest that correctional services funds are those funds *expended* by the correctional facility, not the incoming funds that might, in the absence of the recently enacted statute, be applied to other noncorrectional debts or obligations of the governmental entity.[19]

---

> noncorrectional fund balance but must be carried forward as the county or regional jail authority correctional services fund balance.  Correctional services funds may be expended only for corrections services.

30-A M.R.S. § 924(3) (2012).  Neither section 924, nor any portion of former title 34-A, chapter 1, subchapter 5 defined "correctional services funds."

[19]  The Court opines that the Board had authority over funding sources as well as expenditures. Court's Opinion ¶ 32.  I respectfully disagree.  Section 1803(1)(A) provided that the Board's authority was limited to the following action: "Review, amend if necessary and adopt the correctional services

[¶49]   The Court correctly notes that Somerset County included federal boarding revenues in its budget request to the Board, and the Board based its funding allocations to the County based upon that budget request.   Court's Opinion ¶ 35.  This action by the County would suggest that it accepted the notion that the Board had the authority to consider federal boarding revenues in allocating funding grants to the county jails.  In the middle of fiscal year 2013, however, the County apparently changed its position regarding the Board's authority over federal boarding revenues.  While this midstream change of policy is clearly not conducive to positive inter-governmental relations, the fact remains that past practice, or past positions expressed, cannot create legal authority in the face of contradictory statutory provisions.[20]   Stated otherwise, governmental entities cannot create authority, or erase authority, merely by establishing a practice or policy.

---

*expenditures* in each county budget under Title 30-A, section 710."  34-A M.R.S. § 1803(1)(A) (2013) (emphasis added).

   [20]  *Paradis v. Town of Peru*, 2015 ME 54, ¶ 8, 115 A.3d 610 ("Administrative bodies . . . are statutory in nature and can only have such powers as those expressly conferred on them by the Legislature, or such as arise therefrom by necessary implication to allow carrying out the powers accorded to them." (quotation marks omitted)); *Molasses Pond Lake Ass'n. v. Soil & Water Conservation Comm'n*, 534 A.2d 679, 681 (Me. 1987) ("[I]t is axiomatic that State agencies may exercise only that power which is conferred upon them by law."); *MacDonald v. Sheriff*, 148 Me. 365, 372, 94 A.2d 555 (1953) ("The Commission being purely a creature of statute is subject to the rule universally applicable to all bodies that owe their existence to legislative act.  It must look to the statute for its authority." (quotation marks omitted)); *see also Medellin v. Texas*, 552 U.S. 491, 532 (2008) (saying that "'[p]ast practice does not, by itself, create power'" in the context of executive action by the President) (alteration in original) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)).

30

[¶50] The Board of Corrections argues quite properly that the State should not underwrite the costs of federal prisoners being held in the county jails. This issue could have easily been addressed, if either party had been so inclined, as part of the budget review process. The per capita expense for individual inmates could have been determined, and the budget then reduced by the cost of the number of federal prisoners anticipated to be housed during the budget term. Federal revenues would have been used to pay for federal prisoners; state revenues would have been used to pay for state prisoners. To the extent that the County realized a profit on its federal prisoners, that profit could have been directed toward any other purpose that the Commissioners deemed appropriate and that the law allowed.

[¶51] In this matter, both parties bear some responsibility for the new jail funding process devolving into dispute in Somerset County. The County's fundamental change in its approach to the treatment of federal boarding revenues in the middle of a disbursement cycle signaled a potential crisis in the management of the State Investment Fund. The Board of Corrections had a powerful tool at its disposal, however, to address any perceived overages paid to Somerset County— an adjustment during the next budgeting cycle. The Board's error in exceeding its authority by including federal boarding revenues in its computations was compounded by its unilateral and punitive action of withholding previously authorized allotments to Somerset County. Although I reach this conclusion upon

a rationale that differs slightly from that employed by the Superior Court, I am in full accord with the Superior Court's finding that the Board acted in excess of its authority when it withheld payments from the Investment Fund with a stated purpose to prohibit use of any and all federal prisoner boarding revenues—and particularly amounts in excess of the budgeted $475,960—for payments on jail debt or any other corrections-related purpose. I would affirm the Superior Court's judgment vacating the decision of the Board of Corrections and remanding the matter to the Board for further proceedings to determine how the Board's unmet obligations for fiscal year 2013 should be addressed.

---

**On the briefs:**

> Janet T. Mills, Attorney General, and Andrew L. Black, Asst. Atty. General, Office of the Attorney General, Augusta, for appellant State Board of Corrections

> Michael Hodgins, Esq., and N. Joel Moser, Esq., Bernstein Shur, Augusta, for appellee Somerset County

**At oral argument:**

> Andrew L. Black, Asst. Atty. General, for appellant State Board of Corrections

> Michael Hodgins, Esq., for appellee Somerset County

32

**On the motion to substitute party:**

Michael Hodgins, Esq., and Meredith C. Eilers, Esq., Bernstein Shur, Augusta, for movant and appellee Somerset County

Janet T. Mills, Attorney General, and Diane Sleek, Asst. Atty. General, Office of the Attorney General, Augusta, for respondent and substituted appellant Department of Corrections

Somerset County Superior Court docket number AP-2013-4
FOR CLERK REFERENCE ONLY