James C. MURRAY II et al.

v.

**INHABITANTS OF THE TOWN OF LINCOLNVILLE et al.**

Supreme Judicial Court of Maine.

Argued May 6, 1983.

Decided July 1, 1983.

W.R. Hulbert (orally), Lincolnville, Joseph B. Pellicani, Rockland, for plaintiffs.

Calderwood, Ingraham & Gibbons, Paul L. Gibbons (orally), Terry W. Calderwood, Camden, for Town of Lincolnville Planning Bd.

Verrill & Dana, Michael T. Healy (orally), Portland, for Robert P. Bahre.

James E. Tierney, Atty. Gen., Christine Foster (orally), Augusta, for Bd. of Environmental Protection.

Before McKUSICK, C.J., GODFREY, ROBERTS and CARTER, JJ., and DUFRESNE and ARCHIBALD, A.R.JJ.

McKUSICK, Chief Justice.

Both James C. Murray II and Frank W. Kibbe ("the abutters") own property in the Town of Lincolnville adjoining the tract of land of about 23 acres that is the focus of this lawsuit. In separate administrative proceedings, Robert P. Bahre was granted permission by the Maine Board of Environmental Protection ("BEP") and the Lincolnville Planning Board ("Planning Board") to construct a 44-unit condominium development on the land. The abutters challenged both administrative actions in the Superior Court (Waldo County). In a single decision and order, the Superior Court rejected their arguments in both cases, and the abutters have come to this court on timely appeals, which are here consolidated. Their sole claim on appeal is that Bahre lacked any "right, title or interest" in the land he proposed to develop and that he therefore lacked "administrative standing" to seek and win development approval from the BEP or the Planning Board. We hold that Bahre's contract to purchase the 23-acre tract, conditioned upon the seller's obligation to obtain any necessary subdivision approval, conferred upon him the requisite standing before the administrative agencies. We therefore deny the abutters' appeals.

Since 1971, the land in question has been owned by Gilbert Harmon as trustee for the Land-Ho Real Estate Trust. On May 27, 1981, Harmon entered into a "Contract for the Sale of Real Estate" with Bahre and his wife Sandra. The contract recited that the Bahres had paid Harmon $10,000 as an "earnest money deposit" toward a total purchase price of $260,000. The contract went on to state, in paragraph 3:

> The seller represents that the premises are not part of a subdivision, or if part of a subdivision, the seller has obtained or will obtain approval of the subdivision from appropriate state and local agencies. Failure of the seller to obtain approval of a subdivision plan, prior to the closing date, shall entitle the purchasers at their option to withdraw all monies deposited by them pursuant to this Agreement and be relieved of all obligations.

On June 8, 1981, Bahre applied to the Planning Board under 30 M.R.S.A. § 4956 (1978) for permission to subdivide his contracted-for land into 44 condominium units.[1]

1. Section 4956(1) defines a "subdivision" as "the division of a tract or parcel of land into 3 or more lots within any 5-year period, which period begins after September 22, 1971 ...." Section 4956(4) states:

On June 18, Bahre applied to the BEP under the Site Location Act, 38 M.R.S.A. §§ 481–489 (1978 & Supp. 1982–1983) for its permission to carry out the proposed condominium development.[2]

Appearing at public hearings in opposition to the development, the abutters argued to both the Planning Board and the BEP that Harmon, the owner of the land, needed subdivision approval himself before he could sell the subject property. They pointed out that the 23 acres Bahre wanted to buy were part of a larger parcel purchased by Harmon in 1971, and that Harmon had, in 1975 and 1976, conveyed out two small lots from the original parcel without obtaining subdivision approval from the Lincolnville authorities.

The Planning Board "tabled" Bahre's application on June 19, 1981, and no action was taken on it until November 9. On that day, the Planning Board approved Gilbert Harmon's application for subdivision approval to sell to Bahre[3] and "untabled" Bahre's own pending application. On December 22, 1981, the Planning Board voted unanimously to approve Bahre's condominium proposal.

On January 27, 1982, the BEP issued an order finding that Bahre's proposal met all of the criteria listed in 38 M.R.S.A. § 484 and that Bahre had "sufficient title, right or interest to the property to have standing" before the BEP. The order approved Bahre's application subject to various conditions specified by the BEP. A modified order, issued on May 12, 1982, changed some of the conditions imposed on the developer but otherwise left the BEP's findings intact.

■ The crux of the abutters' claim is that the "Contract for the Sale of Real Estate" between Harmon and the Bahres was void because at the time it was executed it violated 30 M.R.S.A. § 4956(4). Since a void contract is a legal nullity, they argue, the document gave Bahre no "independently existing relationship to regulated land in the nature of a 'title, right or interest' in it which confers legal power to use it, or control its use." *Walsh v. City of Brewer*, 315 A.2d 200, 207 (Me.1974). Therefore, the abutters contend, Bahre had no standing to apply to the BEP or to the Planning Board in June of 1981 for permission to develop the land he sought to purchase.

■ The abutters' argument, however, fails at its inception because the contract signed by Harmon and the Bahres did not violate section 4956(4) when made. The statute states, in pertinent part:

> No person . . . or other legal entity may sell . . . or convey for consideration, offer or agree to sell . . . or convey for consideration any land in a subdivision which has not been approved by the municipal reviewing authority of the municipality where the subdivision is located.

Although the 23-acre lot that the Bahres wished to purchase was "land in a subdivision," and although the subdivision had not been approved by the Planning Board when the contract between Harmon and the Bahres was signed, that contract did not

---

No person, firm, corporation or other legal entity may sell, lease, develop, build upon or convey for consideration, offer or agree to sell, lease, develop, build upon or convey for consideration any land in a subdivision which has not been approved by the municipal reviewing authority of the municipality where the subdivision is located and recorded in the proper registry of deeds . . . .
The Town of Lincolnville's municipal reviewing authority is its Planning Board.

2. "Development" is defined in 38 M.R.S.A. § 482(2) (1978) as "any state, municipal, quasi-municipal, educational, charitable, commercial or industrial development, including subdivi-

sions, which occupies a land or water area in excess of 20 acres . . . ." The statute goes on to state:

> No person shall construct or cause to be constructed or operate or cause to be operated, or in the case of a subdivision sell, offer for sale, or cause to be sold, any development requiring approval under section 483 without first having obtained approval for such construction, operation or sale from the Board of Environmental Protection.

3. Harmon's application was filed on September 17, 1981.

constitute an agreement to sell land in an unapproved subdivision, nor did it contemplate the sale of unapproved subdivision land. Instead, it embodied an agreement to sell land in an approved subdivision, and contemplated a sale that would conform to the requirements of section 4956(4). Paragraph 3 of the contract required the seller, Harmon, to "obtain approval of a subdivision plan" prior to the closing date specified in the document. We cannot read section 4956 to prohibit the making of a contract for the sale of land in a subdivision that is unapproved at the time of the making of the contract, where the agreement by its terms requires the seller to obtain subdivision approval before the sale is consummated.[4] The proposed seller and purchasers did not violate section 4956(4) when they entered into their May 27, 1981, contract for the sale of real estate.[5] That valid contract conferred standing upon Robert Bahre to seek administrative approval for his condominium development from the BEP and the Planning Board.

■ The concept of administrative standing was explained in *Walsh v. City of Brewer,* 315 A.2d at 207, as an "indispensable and valid condition for 'applicant' eligibility." An applicant for a license or permit to use property in certain ways must have "the kind of relationship to the ... site," *id.,* that gives him a legally cognizable expectation of having the power to use that site in the ways that would be authorized by the permit or license he seeks. This principle is intended to prevent an applicant from wasting an administrative agency's time by applying for a permit or license that he would have no legally protected right to use. *Walsh* suggests that whatever the applicant relies on for his "authority" to use the land in the ways permitted by the permit he seeks must be legally enforceable and not revocable "at any moment, at the will of the owners." *Id.* Bahre's rights under the conditional purchase contract satisfy those criteria. A breach by Harmon of his contractual obligation to convey the land to the Bahres would have entitled them to specific enforcement of the contract in the courts. *See O'Halloran v. Oechslie,* 402 A.2d 67, 70 (Me.1979). That the contract is made conditional upon the seller's obtaining subdivision approval does not mean that it is insufficient to confer administrative standing upon the purchaser to seek permission to develop his contracted-for land. The fact that the Bahres could opt out of the purchase under certain circumstances does not deprive them of standing, any more than the owner of property in fee simple could be said to lack standing because he has the right to sell his land at any time.

Our holding today comports fully with the result reached by most courts faced with a question similar to the one here presented. *See, e.g., Arant v. Board of Adjustment of City of Montgomery,* 271 Ala. 600, 604, 126 So.2d 100, 104 (1960) ("the petitioner ... as equitable owner of the property under a contract to purchase conditioned on the grant of the variance, is entitled to apply for it"); *Gray v. Board of Supervisors of County of Stanislaus,* 154 Cal.App.2d 700, 316 P.2d 678 (1956); *City of Baltimore v. Cohn,* 204 Md. 523, 529, 105 A.2d 482, 485 (1954); *Carson v. Board of Appeals of Lexington,* 321 Mass. 649, 75 N.E.2d 116 (1947); *Burr v. City of Keene,* 105 N.H. 228, 230, 196 A.2d 63, 65 (1963)

4. Paragraph 3 specified that failure of the seller to obtain proper subdivision approval would not automatically abrogate the contract, but instead would give the purchasers an *option* to be relieved of their obligations. We recognize that this provision could conceivably result in the sale going forward without the necessary subdivision approval having been procured. That is not what happened in this case, however. And the fact that the performance called for by a contract would violate state law if undertaken without some license or permit does not render the contract invalid or unenforceable on its face, even if there is no specific promise to obtain the necessary permission. *See generally* 6 A. Corbin, *Corbin on Contracts* § 1347 (1962).

5. We therefore need not decide whether a contract executed in violation of section 4956 would be "void," as the abutters claim, or merely "voidable," as appellees assert.

44

("The prospective purchasers were the real parties in interest and the only ones who could furnish the information which the board needed in order to make its decision"); *Humble Oil & Refining Co. v. Board of Aldermen of Town of Chapel Hill,* 284 N.C. 458, 465, 202 S.E.2d 129, 134 (1974) ("a prospective vendee under contract to purchase the property to be affected by the granting of a zoning variance or a special use permit is a proper party to apply therefor ... and the fact that he is bound to take the property only if a zoning variance or special use permit is granted does not deprive him of such standing"); *O'Neill v. Philadelphia Zoning Board of Adjustment,* 384 Pa. 379, 387, 120 A.2d 901, 905 (1956) ("an equitable owner under a conditional contract to purchase stands in the same position as a legal owner in seeking a variance").

 The cited cases all involved purchase contracts conditioned upon the *buyer's* ability to secure the desired license, permit, or variance for the development of the land that the buyer sought to purchase, while the Harmon-Bahre contract was conditioned upon the *seller's* obtaining subdivision approval. A single principle applies to both fact patterns, however: a conditional contract to buy land gives the buyer standing to seek permission to develop or otherwise use that land so long as the condition does not operate to make the entire contract revocable at the whim of the seller.

■ There is no such problem in the case at bar. By the terms of paragraph 3, it was the Bahres, not Harmon, who would have had the option to "be relieved of all obligations" if Harmon failed to secure subdivision approval for the sale. The contract therefore gave Bahre sufficient "title, right, or interest" in the land he had contracted to purchase to seek development

6. In both cases the Superior Court's order was "that Plaintiffs' appeal is denied." Although the intent of the order is made perfectly clear from examination of the court's opinion, the judgments must be modified to comply with M.R.Civ.P. 80B(c), which delimits the judgment in suits to review governmental action:

permission for that land from the BEP and the Planning Board. Bahre had standing to apply to those agencies from the moment the contract was signed.

The entry[6] is:

Judgment of the Superior Court in case No. CV–82–3 is modified to read, "Decision of Town of Lincolnville Planning Board affirmed"; as so modified, that judgment is affirmed.

Judgment of the Superior Court in case No. CV–82–49 modified to read, "Decision of Board of Environmental Protection affirmed"; as so modified, that judgment is affirmed.

All concurring.

The judgment of the court may affirm, reverse, or modify the decision under review or may remand the case to the governmental agency for further proceedings.