STATE OF MAINE
CUMBERLAND, ss.
LOCATION: PORTLAND
DOCKET NO. BCD-APP-2021-00009

JEFFREY MABEE, et al., )
                      )
      Petitioners, )
                      )
v. )
                      )
BOARD OF ENVIRONMENTAL )
PROTECTION, )
                      )
      Respondent. )
                      )
_____ )      **COMBINED ORDER ON PENDING**
                      )      **MOTIONS**
UPSTREAM WATCH, )
                      )
      Petitioner, )
                      )
v. )
                      )
BOARD OF ENVIRONMENTAL )
PROTECTION, )
                      )
      Respondent. )
                      )

## INTRODUCTION

In this consolidated action, Petitioners Jeffrey Mabee, Judith Grace, Friends of Harriet L. Hartley Conservation Area ("Friends"), the Maine Lobstering Union ("IMLU"), Wayne Canning, and David Black (together, the "Petitioners") appeal the November 19, 2020 Decision of the Board of Environmental Protection ("BEP") that approved Nordic Aquafarm, Inc.'s ("Nordic") application for permits related to its proposed salmon farm, including three pipelines to be laid across upland and intertidal land and into the Penobscot Bay. The Petitioners are joined by Intervenors Upstream Watch, The Fish Are Okay, Northpoint Village Corporation, Eleanor Daniels, Donna Broderick, Lawrence Richard, The Gulf of Maine Research Institute, and The

1

University of New England (together, the "Intervenors"). The Petitioners and Intervenors have raised several legal challenges to BEP's decision regarding Nordic's permits. The Court heard oral arguments on the parties' merits briefs on December 17, 2021 in which both parties appeared through counsel. Upstream on January 14, 2022 filed a Motion to Stay, which BEP and Nordic have opposed. For the reasons discussed below, the Court DENIES Petitioners' Motion to Stay and AFFIRMS BEP's Decision approving Nordic's permits.

## FACTUAL AND PROCEDURAL BACKGROUND

In the spring of 2018, Nordic publicly announced its plans to build a $500-million land-based salmon farm and processing plant in Belfast, Maine. Nordic chose Belfast for its site after considering options along the northeast seaboard and finding that Belfast and the adjacent waters of the Penobscot Bay are optimal for the undertaking. The farm requires access to the ocean over upland and intertidal land to allow for the installation of pipes into the sea. The compound will primarily be located on land owned by the Belfast Water District on the west side of Route 1 near the southern town line between Belfast and Northport. Adjacent land to the east of Route 1 for laying the pipes is to be leased and/or acquired from local property owners.

The salmon farm is expected to produce and process approximately 33,000 tons of Atlantic salmon each year. It comprises two components: a primary facility and a seawater access system. The primary facility includes fish tanks and a plant to treat incoming fresh and seawater as well as wastewater discharge. Eight 2-MW generators supplement electricity for the plant by up to 14 MW of capacity, serving as emergency backup and for peak shaving as needed. The use of these generators is restricted to a combined annual fuel limit of 900,000 gallons. The seawater access system consists of two seawater intake pipes and one discharge outfall pipe. The latter will cross

Route 1, extend into intertidal and subtidal areas of coastal wetland, and discharge 7.7 million gallons of treated freshwater per day into Belfast Bay.

On August 6, 2018, Richard and Janet Eckrote (the "Eckrotes") entered into an agreement with Nordic, granting the latter an option to obtain an easement along the border of their lot ("Lot 36") for laying these pipes subject to Nordic's acquisition of the requisite environmental permits and its decision to carry out its plans for the salmon farm (the "2018 Easement Option").

Nordic applied for a Water Permit[1] on October 19, 2018 relating to its wastewater discharge pipes. On November 11, 2018 DEP accepted the Water Permit application as complete for processing and on November 21, 2018 Nordic submitted a second proposed route for the pipes, as shown during a public hearing on December 17, 2018. On January 7, 2019 Mabee, Grace, Upstream Watch, and IMLU filed a written objection to the pipeline route based on allegations that Nordic did not possess sufficient TRI in the property to obtain a permit. On January 30, 2019, the DEP referred the Water Permit to the BEP, a seven-member board appointed by the Governor and confirmed by the Legislature which provides independent decisions on the interpretation, administration, and enforcement of environmental protection regulations and laws.[2] The Water Permit was put on hold until it could be consolidated with forthcoming applications for other, related environmental permits. On April 29, 2019 experts commissioned by Mabee, Grace and Upstream Watch advised Mabee and Grace that they, not the Eckrotes, owned the intertidal land

---

[1] Filed under 38 M.R.S. §§ 414-A(1)(D), 414-A(1)(C), and 464(4)(F) and regulations of Maine's Department of Environmental Protection ("DEP"), 06-096 C.M.R. chs. 520-25, 579, 581, and 587. Required as part of the Maine Pollutant Discharge Elimination System ("MEPDES"), established to comply with the federal Clean Water Act, 33 U.S.A. § 1251 et seq.

[2] Most applications for environmental licenses and permits are processed by DEP staff and decided by the DEP Commissioner but under 38 M.R.S. § 341-D(2), certain applications must be decided by BEP, which has independent decision-making authority in its areas of responsibility. These include licenses which meet at least three of four criteria: (i) those which will have an environmental or economic impact in more than one municipality, territory, or county; (ii) those which involve an activity not previously permitted or licensed in the State; (iii) those which are likely to come under significant public scrutiny; and (iv) those which are located in more than one municipality, territory, or county. Nordic's applications were found to fall under BEP's jurisdiction.

subject to the 2018 Easement Option. Mabee and Grace placed that land under a Conservation easement with Upstream Watch as the holder. On May 17, 2019 Nordic filed applications for permits under Maine's Site Location of Development Act ("SLODA")[3] and the Natural Resources Protection Agency ("NRPA")[4] as well as an Air Emissions License ("AEL")[5].

On May 29, 2019 DEP requested additional information to support Nordic's TRI claim. Nordic filed a 144-page PDF on June 10, 2019 detailing its TRI claim and on June 12, 2019 Mabee, Grace, and Upstream Watch submitted contrary evidence. On June 13, 2019, DEP determined that Nordic had demonstrated sufficient evidence of TRI and had submitted sufficient supporting material to accept the consolidated permit applications as complete for processing. On June 20, 2019 BEP voted to assume original jurisdiction over the consolidated applications and to hold a public hearing pursuant to the Maine Administrative Procedures Act, 5 M.R.S. §§ 8001-11008 ("MAPA"), and 06-096 C.M.R. ch. 3 ("Ch. 3"). BEP at this time granted intervenor status to Upstream Watch and the other Intervenors.

Throughout the application processing period, the Petitioners' and Intervenors' challenges to TRI were rejected by BEP and its Presiding Officer. The Water Permit was premised on sufficient TRI based on the 2018 Easement Option granted by the Eckrotes; Mabee, Grace, and Upstream Watch disputed the Eckrotes' right to grant such an interest, claiming that the intertidal land in question was rather subject to a conservation easement[6] Mabee and Grace had granted to Upstream Watch and which was then assigned to Friends. This intertidal land was the subject of a quiet title suit (the "Lot 36 Litigation") in the Superior Court (Waldo County, *R. Murray, J.*).[7]

---

[3] Issued pursuant to 38 M.R.S. §§ 481-489-E.
[4] Issued pursuant to 38 M.R.S. §§ 411-424-B; not subject to this appeal.
[5] Issued pursuant to 38 M.R.S. § 590 and DEP regulations in 06-096 C.M.R. ch. 115.
[6] Mabee and Grace placed all the intertidal land they claimed under the protection of a conservation easement in perpetuity, pursuant to 33 M.R.S. § 477-A et seq., on April 29, 2019 to underscore their intent to stop Nordic from laying its wastewater pipes there.
[7] *Mabee v. Nordic*, No. RE-2019-18 (Me. Super. Ct., Wal. Cnty., Oct. 28, 2021).

4

On October 24, 2019 BEP visited the proposed salmon farm site in Belfast and from February 11 to 14, 2020 it held a public hearing on the matter. At the close of the hearing, the Presiding Officer held the record open for limited evidence and comments or evaluation from the parties. Written comments were accepted through February 18, 2020. The parties submitted post-hearing briefs and BEP staff submitted a briefing memo to BEP between April 27 and May 4, 2020.

On May 20, 2020 BEP held a deliberative session to discuss the consolidated applications, the record, and statutory licensing criteria with its staff. Staff drafted recommended decisions on the applications and posted them for public comment pursuant to Ch. 3, § 28(B). In November 2020, BEP considered the draft decisions in two meetings and voted in both to approve, thereby granting Nordic's applications for the Water, NRPA, and SLODA Permits and the AEL. BEP issued its final findings and decisions on the applications on November 19, 2020. The Petitioners timely appealed BEP's decisions under Rule 80C in the instant action.

On June 23, 2021 the Eckrotes conveyed all their interest, if any, in Lot 36 and its intertidal land to the City of Belfast and on July 10, 2021, Nordic conveyed all its interest, if any, in Lot 36 and its intertidal land to the same. The City of Belfast exercised eminent domain on August 12, 2021 to take the interests, if any, of Mabee, Grace, and Friends in the intertidal land on which Lot 36 fronts for the stated purpose of allowing Nordic to use it for its pipes. Mabee, Grace, Upstream Watch, and Friends filed an action with the Superior Court (Waldo County, *R. Murray, J.*) contesting the taking on August 16, 2021.[8] The State of Maine Office of the Attorney General has intervened in that action, which is currently pending.

---

[8] *Mabee v. City of Belfast*, No. RE-2021-07 (Me. Super. Ct., Wal. Cnty).

The decision in the Lot 36 Litigation, issued on October 28, 2021, determined that it was the Eckrotes, not Mabee and Grace, who had owned the intertidal land. Mabee, Grace, and Upstream Watch filed motions to amend the judgment and motions for amended and/or additional findings of facts and law as to the Lot 36 Litigation under Rules 52 and 59 of the Maine Rules of Civil Procedure which were denied by the Superior Court (Waldo County, *R. Murray, J.*) on January 10, 2022.[9] The matter was appealed to the Law Court on January 20, 2022.

Upstream Watch has also challenged, under Rule 80B, certain permits granted to Nordic by the Belfast Planning Board, and this matter is also pending in the Superior Court (Waldo County, *R. Murray, J.*).[10]

STANDARD OF REVIEW

Administrative standing, i.e., the standing required for an administrative agency to consider a permit or license application as complete for processing, is based on an applicant's demonstration of sufficient title, rights, or interest ("TRI") in the property subject to the application. 06-096 C.M.R. ch. 2, § 11(D); *Southridge Corp. v. Bd. of Envtl. Prot.*, 655 A.2d 345, 348 (Me. 1995). Judicial standing related to an agency's decision is based on a party's demonstration of a particularized injury resulting from said decision. *Ricci v. Superintendent of Banking*, 485 A.2d 645 (Me. 1984).

Review of agency decisions is "deferential and limited." *Champlain Wind, LLC v. Dep't of Envtl. Prot.*, 205 ME 156, ¶¶ 13, 15, 129 A.3d 279. This standard is based on MAPA. 5 M.R.S. § 11007(d) ("The court may not substitute its judgment for that of the agency on questions of fact."). The court "[will] not vacate an agency's decision unless it: violates the Constitution or statutes; exceeds the agency's authority; is procedurally unlawful, is arbitrary or

---

[9] *Mabee*, No. RE-2019-18 (Me. Super. Ct., Wal. Cnty.).
[10] *Upstream Watch v. City of Belfast*, No. AP-2021-03 (Me. Super. Ct., Wal. Cnty.).

capricious; constitutes an abuse of discretion; is affected by bias or an error of law; or is unsupported by the evidence in the record." *Kroeger v. Dep't of Envtl. Prot.*, 2005 ME 50, ¶ 7, 870 A.2d 566; *accord* § 11007(4)(C); *Forest Ecology Network v. Land Use Planning Comm'n*, 2012 ME 36, ¶ 26, 39 A.3d 74. The court may only vacate findings of fact "if the record contains no competent evidence to support them." *Mulready v. Bd. of Real Estate Appraisers*, 2009 ME 135, ¶ 13, 984 A.2d 1285. Competent, or substantial, evidence "exists when a reasonable mind would rely on that evidence as sufficient support for a conclusion." *Osprey Family Trust v. Town of Owls Head*, 2016 ME 89, ¶ 9, 141 A.3d 1114. The Business & Consumer Court's review of evidence in the record on appeal is identical to the Law Court's review of trial court factual findings for "clear error." *See Gulick v. Bd. of Envtl. Prot.*, 452 A.2d 1202, 1208 (Me. 1982). "[T]he fact that the record contains inconsistent evidence or that inconsistent conclusions could be drawn from the record does not prevent the agency's findings from being sustained if there is substantial evidence to support them." *Seven Islands Land Co. v. Maine Land Use Regul. Comm'n*, 450 A.2d 475, 479 (Me. 1982).

Conversely, the court is not bound by agency interpretations of statutes which that agency administers. However, the court will still give great deference to that interpretation "unless the statute plainly compels a contrary result." *Passadumkeag Mountain Friends v. Bd. of Envt. Prot.*, 2014 ME 116, ¶ 12, 102 A.3d 1181. The same standard applies to an agency's interpretation of its own internal rules, regulations, and procedures. *Becker v. Bureau of Parks & Lands*, 2005 ME 120, ¶ 2, 886 A.2d 1280.

Under 5 M.R.S. § 11007(4), this Court is empowered to affirm BEP's decisions, remand for further proceedings by the agency, or reverse or modify the decision. Because they are seeking to overturn the BEP decisions, Petitioners bear the burden of persuasion on appeal and

7

must overcome the deference this Court is bound to give BEP's interpretations and decisions. *Somerset Cty. V. Dep't of Corr.*, 2016 ME 33, ¶ 14, 133 A.3d 1006.

DISCUSSION

## I. Upstream's Motion to Stay

Upstream Watch has moved for this Court to stay the instant proceedings until the Law Court issues mandates on the Lot 36 Litigation appeal and the appeal, if any, of the eminent domain action currently before the Waldo County Superior Court. This Court is limited in its Rule 80C appeal review to determining whether the BEP abused its discretion, made errors of law, or made factual findings not supported by the record in its approval of the Water Permit, SLODA Permit, NRPA Permit, and AEL. 5 M.R.S. § 11007. The grant of these permits was, as discussed below, based on the BEP's finding that Nordic had demonstrated sufficient TRI in the relevant property for the purposes of processing Nordic's permit applications. It was not an adjudication of the actual ownership of the intertidal land in question, which is the issue in the Lot 36 Litigation currently on appeal before the Law Court. The ultimate outcome of the Lot 36 Litigation appeal is therefore inapposite to this Court's review of BEP's permit grants. Likewise, the outcome of Petitioners' action before the Waldo County Superior Court as to the City of Belfast's use of eminent domain to take Mabee, Grace, and Friends' interest in the intertidal land will not affect this Court's review of the BEP permit grants under Rule 80C. Moreover, this Court is unwilling to delay these proceedings until the Law Court has decided the potential appeal of a case which is still pending before the Superior Court. Consequently, a stay is not warranted and Upstream's motion is denied.

## II. Appeal Merits

The questions relevant to reviewing this appeal pursuant to Rule 80C are (i) whether the DEP erred on 6/13/2019 in determining Nordic had shown sufficient TRI for the purposes of reviewing its permit applications; (ii) whether the BEP Presiding Officer erred on 7/20/2020 in refusing to stay or dismiss the Nordic applications based on the Law Court's 7/7/2020 holding in *Tomasino v. Casco*, 2020 ME 96, 237 A.3d 175; and (iii) whether there was substantial evidence in the record to support the grant of the permits.

A. The DEP's June 13, 2019 Determination of Sufficient TRI Was Not in Error

Petitioners argue the 2018 Easement Option did not establish sufficient TRI such that Nordic could use it as the basis for the administrative standing needed to apply for environmental permits related to Lot 36, meaning the DEP erred in accepting the permit application as complete for processing. In light of the finding in the Lot 36 Litigation, a more foundational question of judicial standing arises, because that suit establishes that Petitioners Mabee, Grace, and Upstream Watch *themselves* do not possess any interest in Lot 36's intertidal land and would therefore lack standing to bring the instant appeal on grounds relating to that property.

In Maine, standing to sue exists where the complaining party has "sufficient personal stake in a justiciable controversy to assure the existence of that concrete adverseness that facilitates diligent development of the legal issues presented." *Halfway House, Inc. v. City of Portland*, 670 A.2d 1377, 1381 (Me. 1996). Standing may exist, for example, where the party makes a reasonable allegation of a potential particularized injury, *Christy's Realty Ltd. Partnership v. Town of Kittery*, 663 A.2d 59, 61 (Me. 1995); the party has a sufficiently substantial interest in the subject of a declaratory judgment, *Smith v. Allstate Ins. Co.*, 483 A.2d 344, 346 (Me. 1984); or the party demonstrates actual deprivation, *Brann v. State*, 424 A.2d 699, 702 (Me. 1981).

9

In administrative appeals, standing to seek judicial review is governed by statute and "depends on the wording of the specific statute involved." *Nelson v. Bayroot, LLC*, 2008 ME 91, ¶ 9, 953 A.2d 378. MAPA governs judicial review of state agency actions and provides a right to review to any person "aggrieved by final agency action." 5 M.R.S. § 11001(1). "Aggrieved" has been interpreted to mean having suffered a particularized injury, i.e., the final agency action operates "prejudicially and directly upon the party's property, pecuniary or personal rights." *Nelson*, 2008 ME 91, ¶ 10, 953 A.2d 378. This particularized injury must be "distinct from any injury experienced by the public at large." *Lindemann v. Comm'n on Governmental Ethics & Election Practices*, 2008 ME 187, ¶ 14, 961 A.2d 538. In narrow circumstances, individuals have been found to have standing to sue based on public rights. *See Fitzgerald v. Baxter State Park Auth.*, 385 A.2d 189, 197 (Me. 1978) (finding five individual plaintiffs, regular users of Baxter State Park, had standing to seek an injunction preventing the use of heavy machinery to clear blowdown because such activity's effect on their use and enjoyment of the park constitutes a "direct and personal injury"). Standing must exist both at the outset of litigation and throughout its existence; if a litigant becomes deprived of his or her ongoing stake in the controversy, the case becomes moot and hence not justiciable *Halfway House*, 670 A.2d at 1379-80.

The Petitioners and Intervenors base their standing on the enforcement of a conservation easement granted by Mabee and Grace to Upstream Watch, purportedly including the intertidal land subject to the 2018 Easement Option between Nordic and the Eckrotes. The Water Permit issued by BEP to Nordic authorizes Nordic to run wastewater pipes along the border of Lot 36 and out into the Penobscot Bay through this intertidal land. The Lot 36 Litigation determined that the land in question at all relevant times belonged to the Eckrotes, not to Mabee and Grace, meaning the attempted conservation easement is void as to the intertidal land which belonged to the

Eckrotes and which has since been conveyed to the City of Belfast. As such, Petitioners have not and will not suffer any particularized injury distinct from the public at large from the grant of the Water Permit or the installation of the wastewater pipes. They lack standing to sue on these grounds and their complaints in relation to Nordic's TRI in the land are thus moot. Intervenors have been granted standing to seek review of the permit application process pursuant to MAPA.

Even if Petitioners did have standing, as do Intervenors, their appeal must fail. "An applicant for a license or permit to use property in certain ways must have 'the kind of relationship to the . . . site,' that gives him a legally cognizable expectation of having the power to use that site in the ways that would be authorized by the permit or license he seeks." *Murray v. Town of Lincolnville*, 462 A.2d 40, 43 (Me. 1983) (quoting *Walsh v. City of Brewer*, 315 A.2d 200, 207 (Me. 1974)). In *Murray*, a purchase and sale agreement conditioned on necessary subdivision approval provided sufficient TRI to invoke administrative standing to petition BEP for approval to develop the property. *Murray*, 462 A.2d at 43. The fact that a purchaser in this situation "could opt out of the purchase under certain circumstances does not deprive [him or her] of standing, any more than the owner of property in fee simple could be said to lack standing because he has the right to sell his land at any time." *Id.* The court in *Southridge Corp.* extended this principle to find that a party claiming title to a disputed parcel by adverse possession in an unresolved action nevertheless demonstrates sufficient TRI in the parcel for DEP to consider that party's permit application as complete for processing. 655 A.2d at 348. The instant case falls between these two, as Nordic held an option to purchase an easement but had not yet entered into a purchase and sale agreement with the Eckrotes. The DEP considered and, at the request of Petitioners, reconsidered several times record evidence on Nordic's claim of TRI and finally determined on June 13, 2019 that it was satisfied by the 2018 Easement Option. Given that even an unresolved adverse

11

possession claim to property provides sufficient TRI for permit applications, this Court agrees that an option arrangement must suffice as well. Once the BEP voted to assume original jurisdiction over the application, this threshold determination of TRI was no longer appealable. The Petitioners were within their rights to request the BEP revisit the issue but the BEP was not obliged to do so.

That Nordic ultimately did not exercise its rights under the 2018 Easement Option Agreement is inapposite to TRI for permit purposes. As BEP correctly notes in its opposition brief, a showing of TRI is only relevant as far as processing of the permit was concerned. The TRI determination was not an adjudication of property rights or a grant of legal ownership; TRI is a threshold question to ensure State resources are not squandered investigating permit applications which the applicant clearly has no legal capacity to utilize if granted. *Murray*, 462 A.2d at 43. The Water Permit does not give Nordic the *right* to build its pipes on the land in question, it is merely the fulfillment of a *prerequisite* to building its pipes. Nordic must separately acquire the right to lay its pipes, whether by grant or easement. The right to use the land for pipes or otherwise is a matter for Nordic to resolve; BEP's permitting process simply ensures that environmental regulatory standards are met.

B. The 7/20/2020 Refusal to Apply *Tomasino* Was Not in Error

Petitioners and Intervenors contend that BEP's Presiding Officer erred and abused his discretion when he refused to apply the Law Court's holding in *Tomasino*, issued two weeks prior to Petitioners' request the holding be considered in this case. 2020 ME 96, 237 A.3d 175. They argue that under the standard established in *Tomasino*, Presiding Officer should have stayed or revoked Nordic's applications pending the outcome of the Lot 36 Litigation over title to the intertidal land.

12

*Tomasino* involves neighboring properties owned by the Tomasinos and the Trust, respectively, which share mirror easements along part of the property border for use as a road. The Tomasinos obtained a permit from the Town of Casco Code Enforcement Office to cut several trees located wholly or partially on Trust land burdened by the Tomasinos' easement to build a gravel driveway. The Trust appealed to the Casco Zoning Board of Appeals, which vacated the permit for lack of administrative standing because it was not clear whether the easement included the right to remove trees. *Tomasino*, 2020 ME 96, ¶ 7, 237 A.3d 175. That decision was affirmed by both the Superior Court, reviewing in its intermediate appellate capacity, and the Law Court. The Law Court distinguished *Tomasino* from its earlier decisions in *Walsh*, *Murray*, and *Southridge*, noting that the latter three cases all

> involved the question of whether the applicants had sufficient connections to the *title* to the properties to seek municipal or agency permits on those properties, and in each case, there was no question but that the title owner of the property, once its identity was established, would be able to make use of the property as permitted according to applicable ordinances and statutes.

*Tomasino*, 2020 ME 96, ¶ 14, 237 A.3d 175; *see also Southridge Corp.*, 655 A.2d t 348; *Murray*, 462 A.2d at 43; *Walsh*, 315 A.2d at 205, 207-08. The Court continued that in the face of a dispute between private property owners, the requirement that an easement allows the type of activity a permit is sought for "is not met by an easement whose parameters have not been factually determined by a court with jurisdiction to do so." *Tomasino*, 2020 ME 96, ¶ 15, 237 A.3d 175.

The instant case aligns with *Southridge*, *Murray*, and *Walsh*, not with *Tomasino*. There is no dispute about the scope of the 2018 Easement Option, either in its location or what it allows. The quiet title suit between Mabee and Nordic was a dispute about ownership, not easement parameters. The only question, as in the earlier cases, was who owns the land burdened by the easement and thus who was able to grant an easement interest, and as such no involvement of a

13

court with the jurisdiction to determine the easement's parameters was necessary. The Presiding Officer did not err by refusing to stay or revoke Nordic's permit pending the outcome of the Lot 36 Litigation, nor did the BEP err by not conditioning the permit on a judgment that Mabee and Grace did not possess an interest in the intertidal land because such a condition is unnecessary. Logically, Nordic can only utilize the permit on land in which it has an interest allowing it to use the land for the permitted purpose. Though it is under appeal, the Lot 36 Litigation is the current law of the case and because it was resolved in Nordic's favor, this point is now moot.

C. <u>Substantial Record Evidence Exists to Support Grant of Permits</u>

Petitioners and Intervenors contest many of BEP's findings made during Nordic's permitting process. Specifically, they assert BEP's findings regarding NRPA dredging rules; Water Permit requirements regarding the use of zero-waste technology, water quality standards, and State antidegradation statutes; air emissions rules; and SLODA requirements were erroneous as not based on substantial record evidence. 38 M.R.S. § 414-A requires BEP to affirmatively find an applicant has met requisite standards prior to issuing a permit or license. As such, Upstream Watch seeks the invalidation of Nordic's NRPA Permit, Water Permit, AEL, and SLODA Permit under MAPA for failure to make such affirmative findings. Upstream Watch overstates this Court's capacity to overturn administrative decisions; review of BEP decisions on appeal is "deferential and limited," *Champlain Wind*, 2015 ME 156, ¶ 13, 129 A.3d 279, and the standard for substantial record evidence is very low, *Osprey Family Trust v. Town of Owls Head*, 2016 ME 89, ¶ 9, 984 A.2d 1285.

a. *NRPA Permit*

NRPA requires under 38 M.R.S. § 480-D(9) that proposed activities involving dredging, dredge spoils or transporting dredge spoils by water demonstrate, with sufficient public involvement, "the transportation route minimizes adverse impacts on the fishing industry and that the disposal site is geologically suitable." The DEP found the installation of seawater and wastewater pipes for the salmon farm qualifies as dredging and applied this statute, which requires the Commissioner of the Department of Marine Resources ("DMR") to provide an assessment of potential impacts on the area to be dredged and on local fishing operations. § 480-D(9). The DMR held a public hearing, submitted comments to the BEP, and requested sediment testing along the pipes' route. It recommended measures, which were added to the permit conditions, to prevent siltation when transporting excess dredge material by barge to Mack Point in Searsport, where it will by transported by truck to an upland disposal site. On the basis of the DMR's comments, the sediment testing results, predictions of contaminant dispersion, and public comments, the BEP found that the dredging connected to Nordic's project would not cause an unreasonable adverse effect under § 480-D(9).

Petitioners argue the BEP improperly refused to admit evidence in the form of a map of the dredge spoils disposal route presented at the DMR hearing into its own record. Petitioners wanted a hearing to determine whether Nordic had materially changed its dredge spoils disposal plan, though Nordic denies any deviation from the permitted plan. Given the lack of good cause shown by the Petitioners to reopen the BEP record and admit this additional evidence, this Court may infer it was proper for the BEP to deny their motion on the disposal plan details.

Other arguments put forth by Petitioners on the NRPA Permit are inapplicable. They say the BEP should have conditioned this and other permits on Nordic's obtaining of other, related

stated and federal permits. However, a successful permit applicant must still comply with all other applicable regulations and acquire all other relevant licenses; there is generally no need to condition one permit on the acquisition of another. Moreover, the permits Petitioners believe should have been made prerequisite to the NRPA Permit are inapplicable to Nordic's proposed activities. For example, Petitioner argues the BEP erred by not requiring an additional type of Water Permit, related to solid waste disposal at Mack Point, to grant the NRPA Permit. But Nordic does not propose disposing of any solid waste at Mack Point. That is only the point at which the dredge spoils will be unloaded from barges onto trucks for disposal elsewhere, and the BEP found, based on record evidence, that the ultimate disposal site is properly licensed. NRPA also sets forth requirements for projects involving "dredge spoils disposal in a coastal wetland," including (i) collecting and testing the dredge spoils; (ii) publishing notice of the proposed route for transporting the dredge spoils to a disposal site; and (iii) submitting the application to each municipality adjacent to any proposed marine and estuarine disposal site and route, 38 M.R.S. § 480-E(3), and Petitioners contend the BEP's decision violated testing and notice requirements. However, Nordic's project does not envision disposing dredge spoils in the costal wetland and the NRPA permit as granted does not provide for such disposal, rendering § 480-E(3) irrelevant.

    b. *Water Permit*

        i. The BEP Did Not Abuse Its Discretion in Finding Nordic's Proposal is the Best Practicable Treatment

Upstream Watch contends that the Water Permit should have been denied because Nordic's proposed water treatment system is not the "best practicable treatment" for its discharge and that the BEP abused its discretion by failing to consider zero-discharge systems. Under § 414-A(1)(D), where pollutants will be discharged, a Water Permit is only available if "[t]he discharge will be

16

subject to effluent limitations that require application of the best practicable treatment." The best practicable treatment is that which applies the "best conventional pollutant control technology or best available technology economically achievable" for a given type of discharge source which the DEP determines to be best calculated to protect and improve the quality of the receiving water and which is consistent with the federal Clean Water Act and other federal regulations. § 414-A(1)(D). According to Upstream Watch, only a "zero-discharge" system would fulfill these requirements. Nordic counters that the CWA expressly allows for non-zero-discharge systems that otherwise comply with the Act and that zero discharge is a stated goal, not a requirement. "Best practicable treatment" is a distinct standard from "best available treatment." The best available technology may not be economically or pragmatically feasible in a given project, making it non-practicable, and the statutory language recognizes this. In the case of the salmon farm, BEP made findings, based on evidence presented by Nordic, that Upstream Watch's proposed zero-discharge technology is not scalable to the size of the project.

A lack of an explicit, written finding that the zero-discharge technology is not practicable in the context of the proposed salmon farm does not equate to a lack of a finding on the matter. This Court may infer BEP considered and rejected the zero-discharge proposal because "the subsidiary facts may be obvious or easily inferred from the record and the general factual findings." *Fair Elections Portland, Inc. v. City of Portland*, 2021 ME 32, n. 11, 252 A.3d 504. BEP heard and considered conflicting oral and written testimony about the implementation of zero-discharge processes and Upstream Watch submitted written filings, including examples of this technology. Consequently, this Court infers BEP, in its judgment, rejected this technology as not being the "best practicable treatment" because BEP issued a permit for a different sort of treatment process after reviewing such evidence. Moreover, the language of § 414-A(1) states that the agency "shall"

17

issue wastewater discharge permits where it makes the enumerated findings. The agency may not require redesigns or a "best available treatment" even if a better process is available so long as the criteria of § 414-A are met. The BEP both applied the narrative National Effluent Guidelines, 40 C.F.R. § 451.1, and, in its best professional judgment, set numeric standards for pollutants from this type of discharge, ultimately finding that Nordic's proposal complies with § 414-A as the best practicable treatment.

ii. The BEP Did Not Abuse Its Discretion in Finding Proposed Discharge Does Not Violate Maine's Antidegradation Statutes Nor Temperature Standards

Discharging pollutants into State waters requires a permit under 38 M.R.S. §§ 361-A(7) & 413. § 414-A(1)(C) generally prohibits discharge permits where the discharge will lower the existing quality of a body of water below its current grade. Where discharges would lower water quality, the BEP must find the discharge "is necessary to achieve important economic or social benefits to the State and when the action is in conformance with subparagraph (3) [requiring periodic reporting on water quality to the Legislature]." 38 M.R.S. § 464(4)(F)(5). Similarly, Ch. 582 of the DEP Rules states discharge of pollutants may not change the monthly mean ambient temperature of a tidal body of water by more than a set amount. 06-096 C.M.R. ch. 582 § 5. Minimum standards for State bodies of water are set out in a water quality classification system under §§ 464(1) and 469. Upstream Watch's arguments as to BEP's findings regarding the effect Nordic's wastewater discharge will have on the water quality and ambient temperature of Belfast Bay are not persuasive. It is beyond the scope of this appeal for this Court to second-guess BEP's factual findings "on matters falling within its realm of expertise." *Mulready*, 2009 ME 135, ¶ 13, 984 A.2d 1285 (quoting *Wood v. Superintendent of Ins.*, 638 A.2d 67, 71 (Me. 1994)).

18

Upstream Watch claims the BEP improperly made its findings on water quality in the context of nitrogen absorption levels based on evidence admitted after the close of the record. To the contrary, the BEP used data already in the record to reassess its findings after Nordic noted that BEP staff had incorrectly calculated nitrogen levels using a worst-case scenario in lieu of the standard, long-term tidally averaged valuation. The Presiding Officer reopened the record to allow all parties to comment on the new calculations and use of the exiting data and provided Intervenors with the emails on the subject between Nordic and BEP staff for their review. After recalculating, BEP staff concluded in a revised memorandum that the proposed discharge would still slightly lower water quality due to nitrogen levels, thus requiring the BEP to specifically approve the discharge under § 464(4)(F)(5), which it did. The BEP also requires Nordic to conduct post-permit studies to monitor dilution factors to ensure compliance with the Water Permit. This is an open and fair deliberative process.

Upstream Watch also contends the BEP was wrong to use surface water temperature measurements when calculating the impact Nordic's wastewater discharge will have on the mean ambient temperature of Belfast Bay. This is an improper argument in this appeal. Moreover, the BEP has provided a reasonable rationale for its methods, noting that the warmed water will naturally rise to the surface from the deeper point at which the discharge pipes enter the bay, and points to 38 M.R.S. § 451, which specifically allows for a reasonable mixing of effluent and receiving water. The BEP heard extensive testimony on thermal discharge and considered models demonstrating the thermal impact and buoyancy of Nordic's effluent and concluded that the discharge will meet the criteria of Ch. 582, conditioning the permit on regular monitoring of receiving water temperature. The record shows the BEP considered substantial, competent evidence. This Court cannot question either the BEP's findings or its choice of methodology in

reaching these findings, only whether it abused its discretion; Upstream Watch has not demonstrated any such abuse.

c. *Air Emissions License*

Under 38 M.R.S. § 590 and the federal Clean Air Act, the DEP licenses sources of pollutant air emissions, implemented by 06-096 C.M.R. ch. 115. Section 4(C)(6) of Ch. 115 sets out the requisite criteria an applicant must demonstrate for new minor sources of air emissions, and the DEP must grant a license if these criteria are met. A "minor source" is defined as any source which emits or has the potential to emit regulated pollutants excluding greenhouse gases at rates less than significant emissions[11] and is not defined as a Part 70 source. 06-096 C.M.R. ch. 100 § 89. These criteria comprise (i) providing the DEP a complete application; (ii) showing the emissions will receive the Best Available Control Technology ("BACT")[12] as described in subsection 4(A)(4)(d); (iii) showing the emissions will not violate state standards adopted by the DEP under 38 M.R.S. § 585 or can be controlled so as not to violate them; (iv) showing the emissions will not violate or can be controlled not to violate specified ambient air quality standards; (v) showing the conditions of the license provide for compliance with all relevant State and Chapter requirements; showing the DEP and applicant complied with public participation and review under subsection 4(C)(3); and (vi) in the case of an AEL amendment, installing additional emissions controls or mitigating measures, if necessary, within twenty-four months of the issuance of the amendment. 06-096 C.M.R. ch. 115, § 4(C)(6). Upstream Watch argues the BEP misinterpreted § 590 and Ch. 115

---

[11] Defined as any rate of emissions which would equal or exceed one hundred tons per year of any regulated pollutant excluding greenhouse gases or fifty tons per year of volatile organic compounds in the ozone transport region. 06-096 C.M.R. ch. 100 § 156.

[12] The statutory standard is "best practical treatment," which is lower than BACT. For the purposes of this appeal, the Court will assume the stricter standard controls. *Compare* 38 M.R.S. § 590(2)(A) *with* 06-096 C.M.R. ch. 115 § 4(C)(6)(b).

when it categorized Nordic's facility as a "minor" source because Nordic did not disclose its full power demand and because Upstream Watch is uncertain that Nordic will operate within the annual limit of 900,000 gallons of fuel for its backup generators imposed by the BEP in the AEL. Upstream Watch's opposition to the grant of the AEL revolves around these generators and the emissions they will produce.

These are questions of fact. The record shows the BEP found Nordic qualifies as a "minor source" because of the fuel limit imposed in the AEL. Nordic intends to use the generators for backup power and peak shaving while primarily using electricity from the local grid, so the issue of the total power draw by the facility is inapposite. Only the expected use of the generators is relevant, the BEP found usage within the fuel limit will meet permit requirements, and Nordic testified it believes the limit is several times higher than what it will actually need. In the event of a power outage, the generators will provide necessary, short-term emergency electricity, not power full-scale facility operations. The record also shows peak-shaving usage of generators will be limited and will not use more fuel than conditioned by the license. Should Nordic be forced to exceed the AEL fuel limit for any reason, it will have to apply for an amendment to the AEL.

Under § 590(2)(C), an AEL applicant's emissions must not violate or must be controlled so as not to violate applicable ambient air quality standards "[e]ither alone or in conjunction with existing sources." Judicial interpretation of this statute is de novo but great deference is given to the BEP's reading, which will not be refuted unless the statute "plainly compels a contrary result." *Passadumkeag Mountain Friends*, 2014 ME 116, ¶ 12, 102 A.3d 1181. Upstream Watch argues that "other existing sources" should be interpreted as including *all* other emission sources from the salmon farm. The BEP, however, considers "other existing sources" to mean only sources which are not exempt or insignificant, and thus not subject to licensing, under Ch. 115 App. B. The other

21

emission sources from the salmon farm include the fish processing plant, the wastewater treatment plant, the office building, and fish grow-out buildings, among others. It is reasonable based on evidence in the record for the BEP to have considered these other sources as exempt or insignificant and thus did not consider them when calculating the generator emissions' effect on air quality. *See generally* Ch. 115 App. B § A. The record also shows that the BEP considered the effect of generator emissions under a conservative assumption that the generators were in constant use despite the fuel limit and stated intentions of Nordic to use them a fraction of that amount. Even under this assumption, the BEP found no violation of ambient air quality standards. Upstream Watch has not carried its burden to show the statute plainly compels a result contrary to that which the BEP reached.

#### d. *Site Location of Development Act Permit*

SLODA requires the builder of a development of state or regional significance which may substantially affect the environment to demonstrate certain licensing criteria. 28 M.R.S. §§ 481-490-E; 06-096 C.M.R. ch. 375. These criteria, set out in § 484, address a number of environmental concerns and require a developer to show, among other things, "that the development will not adversely affect existing uses, scenic character, air quality, water quality or other natural resources in the municipality or in neighboring municipalities." The BEP must issue a permit to an applicant who meets the stated criteria. Upstream Watch argues the BEP did not properly find that Nordic met the SLODA permitting requirements.

The BEP considered emissions from both the permanent generators, *see supra*, and those produced by equipment during the construction of the facility and found no adverse impact on air quality. It also analyzed record evidence on how the facility will impact freshwater resources and determined that Nordic's strategic use of a variety of groundwater sources will not

22

adversely impact local resources, conditioning the permit on Nordic's monitoring of the Little River reservoir and other wells for adverse effects. Upstream Watch has not shown a lack of record evidence in support of the BEP's findings for SLODA permitting purposes.

CONCLUSION

Based on the foregoing, the entry will be: Petitioner Upstream's Motion to Stay is DENIED. Respondent BEP's decision is AFFIRMED.

SO ORDERED.

The Clerk is requested to enter this Order on the Docket, incorporating it by reference pursuant to M.R. Civ. P. 79(a).

Date: **2/23/2022**

**M. Michaela Murphy, Justice**
**Business & Consumer Court**

Entered on the docket: 02/23/2022

23

STATE OF MAINE                                    BUSINESS AND CONSUMER COURT
CUMBERLAND, ss                                    BCD-APP-2021-00009

JEFFREY MABEE, et al.,                    )
                                          )
    Petitioners,                          )
                                          )
v.                                        )
                                          )
BOARD OF ENVIRONMENTAL                    )
PROTECTION,                               )
                                          )
    Respondent.                           )
                                          )
_____         )       **COMBINED ORDER ON MOTIONS**
                                          )
UPSTREAM WATCH,                           )
                                          )
    Petitioner,                           )
                                          )
v.                                        )
                                          )
BOARD OF ENVIRONMENTAL                    )
PROTECTION,                               )
                                          )
    Respondent.                           )

Before the Court are two motions brought by Petitioners that were still pending before the Waldo County Superior Court when these consolidated cases were transferred to this Court.

The first seeks leave to exceed page limits set by M.R. Civ. P. 7(F). The second is a Motion to Amend Petition, Permit Discovery and for an Order Specifying the Course of Future Proceedings.

The Court has reviewed the filings of the parties and for the reasons stated, denies both the Motion to Exceed Page Limits as well as the Motion to Amend, Permit Discovery and to Specify the Course of Future Proceedings.

With respect to the motion regarding page limits, which is opposed, the Court has reviewed the motion as well as the many pages of attachments to what is usually presented as an unopposed procedural motion. Because the many documents attached are directly pertinent to the second, more substantive

1

motion, the outcome of the first motion is controlled by the Court's analysis and conclusion as to the second.

The second motion is captioned as Motion to Amend Petition, Permit Discovery and to Specify the Course of Future Proceedings, and it seeks three things. First, it seeks to clarify that the proper Respondent in this case should be the Department of Environmental Protection (DEP) and not the Board of Environmental Protections (BEP). Second, it seeks to add independent claims. Third, the motion seeks to conduct discovery on those claims.

As to the motion to have the Respondent designated as the DEP instead of the BEP, that request is denied. As current Respondent BEP points out, it was BEP that issued the permitting decisions that are under appeal by Petitioners. The BEP is therefore the proper party. The Board acted as fact-finder in this case and it will be the Board's findings and conclusions that will be reviewed.

With respect to the motion to add independent claims and conduct discovery, the Petitioners argue that materials outside the record in the form of email communications made in the first few weeks of 2019 provide a basis for independent claims. These emails can fairly be described as emails between members of the Governor's Office, the DEP Acting Commissioner, Nordic and other third parties including the Governor's brother who was also during this time frame working as a member of the Governor's Transition Team. All the emails, along with a meeting that took place involving some of these individuals, pre-date the formal application process before the agency. They do support the proposition that the project at issue was one that was favored by the Administration. However, these preliminary discussions are not enough, in the Court's view, to overcome the presumption of good faith this Court is obligated to apply to the decision makers at the BEP. *See Beal v. Town of Stockton Springs*, 2017 ME 6, ¶ 19, 153 A.3d 768 (quoting *Mr. & Mrs. V. v. York Sch. Dist.*, 434 F. Supp. 2d 5, 12-13 (D. Me. 2006)) (administrative agency officer "enjoys a presumption of honesty and integrity"). At the time of these communications, the BEP had not yet asserted jurisdiction over the application at issue here, and no part of the adjudicatory process had yet begun. And as pointed out by Respondent BEP, there is no indication

at all that the BEP was ever made aware of these very preliminary inquiries or communication described in the emails at issue. The Court is also unpersuaded that because the BEP is permitted to rely upon DEP staff during the BEP process, the administrative proceeding was somehow defective or was inappropriately affected by political influence.

For these reasons, the Court will deny the motion to add independent claims or to conduct discovery on those claims. This decision obviates the need to consider the third part of the motion which seeks to obtain an Order specifying the course of future proceedings, and it determines the outcome of the motion seeking to exceed page limits.

The entry will be: The Motion to Exceed Page Limits is DENIED. The Motion to Amend Petition, Permit Discovery, and for on Order Specifying the Course of Future Proceedings is also DENIED. The Clerk shall note this Combined Order on the docket by reference pursuant to Rule 79(a) of the Maine Rules of Civil Procedure.

11/18/2021

_____

**DATE**

_____

**M. Michaela Murphy**
**SUPERIOR COURT JUSTICE**

Entered on the docket: 11/18/2021

3